United States District Court
Eastern District of Michigan

Richard A. Campbell and
Mary M. Campbell,

    Plaintiffs,

Case No. 03-40154

vs.

Hon.

Bridgeview Marina, Ltd.
Needham's Marine, Ltd. and
Captain's Yachting Service, Ltd.,

    Defendants.

_____/

Potter, DeAgostino, Campbell & O'Dea
STEVEN M. POTTER (P33344)
RICK J. PATTERSON (P55706)
Attorneys for Plaintiffs
2701 Cambridge Court, Suite 223
Auburn Hills, MI 48326
248-377-1700/248-377-0051 fax

_____/

FILED

JUL - 1 2003

CLERK'S OFFICE
U. S. DISTRICT COURT
EASTERN MICHIGAN

## Complaint

There is no other civil action between these parties
arising out of the same transaction or occurrence as
alleged in this complaint pending in this court, nor
has any such action been previously filed and
dismissed or transferred after having been assigned
to a judge, nor do I know of any other civil action,
not between these parties, arising out of the same
transaction or occurrence as alleged in this
complaint that is either pending or was previously
filed and dismissed, transferred, or otherwise
disposed of after having been assigned to a judge in
this court.

RICK J. PATTERSON (P55706)

1) Plaintiffs are citizens of the State of Michigan, United States of America.

2) Defendants are citizens or subjects of the Province of Ontario, Canada.

3) The amount at issue in this action exceeds $75,000.00.

4) All Defendants are located in Point Edward, Ontario, which is at the base of the Blue Water Bridge across from Port Huron, Michigan, and less than 1 mile from the state of Michigan, United States of America.

5) All Defendants have represented to Plaintiffs, and hold out to others, that they are all under one ownership and that they operate essentially as one entity.

6) Defendants seek the business of and cater to United States citizens as customers, and in fact approximately 250 of the boats in Bridgeview Marina are owned by U.S. citizens.

7) A significant percentage of the service and repair work performed by Needham's and Captain's is performed on boats owned by U.S. citizens, which boats are intended to be operated in U.S. waters.

8) Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332.

### Factual Background

9) On September 1, 2000, the sailing vessel Gael, which is owned by Caribbean Vacations, Ltd., Plaintiffs' assignor with

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

regard to a portion of this claim, was caught in a storm and forced aground outside the harbor at Lexington, Michigan.

10)    Gael suffered extensive damage in the grounding. Her bilge was breached and she took in water, requiring that the hull and all systems aboard Gael be inspected and repaired as necessary.

11)    Following the grounding, Plaintiffs moved Gael to Defendant's facilities, which facilities had also served as Plaintiff's dockage, and from which facilities Plaintiffs had in fact sailed on the trip which ended in the grounding.

12)    Defendants suggested to Plaintiffs that they repair Gael, and in response to those suggestions, Plaintiffs negotiated with the Defendants for such repair.

13)    Plaintiffs were aware that Defendants did not have an electrician or an expert marine mechanic on staff. Plaintiffs engaged a competent electrician/mechanic to make the electrical/mechanical repairs on Gael in conjunction with Defendants' work on the hull.  However, the Defendants refused to accommodate the Plaintiffs or their electrician/mechanic. The Defendants demanded unreasonable concessions from Plaintiffs' electrician/mechanic, effectively denying the electrician/mechanic access to the Defendants' yard, and to Gael. Such machinations by the Defendants were all made without regard to the need to

properly repair Gael, and were made with the intent of securing the contract for repair for themselves, while knowing they did not have the personnel necessary to do the work.

14)  Defendants made significant representations to Plaintiffs upon which the Plaintiffs relied to Plaintiffs' detriment and loss in that, while denying Plaintiffs' electrician/mechanic access to their yard, Defendants advised Plaintiffs that they had hired a competent electrician/mechanic, who would do all of Plaintiffs' work.  As a result of Defendants' representations, Plaintiffs abandoned their quest for a competent electrician/mechanic and accepted Defendants' assurance of competent repair.

15)  Based on those negotiations and on representations made to Plaintiffs with regard to the expertise necessary to repair Gael, and the fact that the Defendants possessed such expertise, or, where necessary would obtain such expertise, Plaintiffs contracted with the Defendants, collectively, to repair the hull and all systems on Gael as  necessary to the highest standards in the maritime industry.

16)  The Defendants were to carefully inspect every aspect of Gael, determine the needed and necessary repairs, and make all such repairs. All the Defendants were involved in this process.

17) Plaintiffs also negotiated for and contracted with the Defendants to make certain upgrades and repairs not related to the grounding of Gael; specifically, a new bow-thruster and new exhaust hoses for the diesel propulsion engine, as well as repairs to hatches, side-lites, and cabinet tops.

18) Gael was delivered to the Defendants for repair on or about mid September 2000 with the understanding that the work would be completed by or about the end of June, 2001.

19) Defendants failed to complete the repairs to Gael by the end of June of 2001 and in fact had done very little work by that time.

20) Defendants continued in possession of Gael for the purpose of completing the repairs after many excuses and misrepresentations, until on October 11, 2001, Defendants contacted Plaintiffs and represented that Gael was fully repaired and was ready for sea trial.

21) The sea trial, conducted with Tony Shepherd, Defendants' yard manager and agent, and Mike Thompson, Plaintiffs surveyor, revealed, however, that Gael was still in a significant state of disrepair. The remaining and improperly repaired items included, but are not limited to, the following particulars:

    A. The throttle was not operating normally and in addition it was slipping;

POTTER, DeAGOSTINO, CAMPBELL & ODEA

B. The radar scanner was not working properly;

C. There was a crack in the mast just below the deck;

D. The masthead tricolor light was not working;

E. The anchor light was not working;

F. The electrical connections on the anchor windlass were loose and were missing the necessary lock washers;

G. There was an oil leak at the anchor windlass mount plate;

H. The water heater was not properly placed and was not secured;

I. The new batteries as installed by Defendants for both the main bank and the engine bank were not covered and were not secured;

J. There was no drain hole at the base of the mast and the mast was not pinned or bolted to the mast step;

K. There was a diesel fuel leak under the aft cabin bunk and Gael generally smelled of diesel fuel;

L. The #1 and #3 fuel injectors were leaking fuel oil;

M. Contrary to Defendants invoices, which included a charge of $1,440.00 CDN for cleaning the water and fuel tanks, the fuel filters were dirty and needed changing and the fuel in both tanks needed to be polished, and all of the water tanks were putrid;

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

N. When the gearshift was in forward, the boat went backward and when the gearshift was in reverse the boat went forward;

O. The newly installed bow thruster was making abnormally loud noises;

P. The water petcock at the transmission was leaking;

Q. The drive shaft had a wobble;

R. There was a water leak under the galley sink;

S. The electrical connections at the wash down pump were not heat-shrunk;

T. The single side band radio had noise from the engine;

U. The VHF/FM marine radio did not work;

V. The boat was not performing properly; the top speed was 5.9 knots (it should have been at 7 plus knots);

W. The entire boat was filthy;

22) Plaintiffs at this point discontinued their inspection, time and patience having run out, and based on the assurance of Tony Shepherd, the agent for all Defendants, that the above defects, and all other deficiencies would be repaired and/or corrected, Plaintiffs left Defendants in possession of Gael to continue the repairs and make the corrections.

23) On December 5, 2001, Defendants faxed a "final invoice" to Plaintiffs, representing again that all work was done and that Defendants were requesting payment in full.

24)   Plaintiffs were out of town at the time of receipt of the invoice, and were unable to inspect Gael, but they called Defendant and spoke with Tony Shepherd expressing concern because there was need for additional sea trials and as a result there would undoubtedly be areas of dissatisfaction and additional warranty and repair work.

25)   Tony Shepherd expressed dismay over any delay and over the cash-flow problems that such a large balance was causing the operation at Captain's Yachting Service Ltd., though there had been interim payments of about $70,000.00, and the balance was, at that time, about $28,864.99, or about 30% of the total repair.

26)   Because of those pleas, and based on Tony Shepherd's assurance that close attention and absolute correction would attend all complaints, Plaintiffs paid almost the entire balance, or $23,962.89, without first inspecting Gael.

27)   It was now the end of January, 2002, and Gael had been in the possession of Bridgeview Marina or its affiliates for approximately a year and one-half as a vessel under repair. At Defendants' request, Plaintiffs had, in the fall of 2000, paid for dockage for the year 2001. Payment seemed reasonable at the time based on the belief that Gael would be ready for use in June of 2001.

28) Because of the delays occasioned by Defendants inaction, and since Plaintiffs had lost the use of Gael, and her dock, for 2001, Plaintiffs asked Bridgeview for a credit toward the 2002 year, with the expectation that Gael, as promised, would be ready to sail in the spring of 2002.

29) Because of all the work that was to be done on Gael, and the need to protect and preserve that work, and aware that Gael had spent the previous winter outside and unprotected, Plaintiffs requested that Gael be kept inside the heated work facility.

30) Plaintiffs were advised that, because of the need for inside space specific to the boat then being worked on, and due to the small available inside work area, and because other boats would be brought into the heated building as they were being worked on, Gael would be stored outside.

31) Defendants proposed that they would credit the Plaintiffs with dockage for the 2002 year, and for an additional payment of $2,707.00 CDN they would store Gael indoors.

32) Plaintiffs were deeply concerned with the consequences of outside storage on Gael while she was under repair, and so they agreed to and made the requested additional payment to Defendants in return for inside storage.

33) In fact, no work was done on Gael that winter, and as a result, she simply sat inside in Defendants' unheated

facility until spring when the Defendants resumed working on her.

34) On about June 4, 2002, Plaintiffs arrived at Bridgeview Marina to examine Gael, and hopefully take possession of her and sail her for the summer. At this point, Gael had been in Defendants' repair facility for nearly two years.

35) Upon inspection of Gael, Plaintiffs discovered, among many other things, that there were three winches and one halyard missing from her mast, and as a consequence, Gael could not be sailed.

36) Plaintiffs queried of Defendant and were advised by Tony Shepherd that the winches and halyard had been stolen from the mast sometime during the winter of 2001/2002, prior to April 14, 2002, while the mast was stored in a field at the edge of the Bridgeview property rather than inside as required by the agreement between the Plaintiffs and Bridgeview.

37) Though Defendants had possession of Gael, and knew that Plaintiffs were out of town, Defendants had not advised Plaintiffs of the theft, nor had they replaced the winches or halyard.

38) Defendants had now breached their contract to timely repair Gael, their contract for bailment for hire, as well as their contract for inside storage. As a result of the latest

breach, the winches and halyard were stolen from Gael, and as a consequence, Plaintiffs continued to lose the use of Gael, as well as lose the opportunity for proper sea trials.

39)  The Defendants did not replace the winches and halyard until the end of July 2002, and as a result, Plaintiffs could not satisfactorily sea-trial Gael, nor could they enjoy sailing her.

40)  In the meantime, however, again based on the representations of Tony Shepherd, and still believing in him, the plaintiffs foolishly paid the rest of the balance due on the contract for the repairs.

41)  When the winches and halyard were replaced, and the first sea-trial conducted, Plaintiffs discovered that, among other things, the engine alternator was charging in an amount in excess of the allowable amount for the new gel-cell batteries that the plaintiffs' invoices reflected had been installed in both the main bank and in the engine bank.

42)  During the sea-trial, Plaintiffs also discovered that the bilge pumps were not operating properly and that there was an unknown water source leaking excessive water into the bilge.

43)  Plaintiffs advised Tony Shepherd of their concern with regard to both the charging problem and the bilge pumps.

44)  Defendants remounted the stand for the two smaller bilge pumps, but the problem continued. In spite of repeated

requests, to the point that the Plaintiffs were beginning to sense they were considered a nuisance, nothing more was done by the Defendants.

45)   During the sea trial, Plaintiffs also discovered that the anchor light was not working, and in fact, it turned out the anchor light was missing.  Tony Shepherd said there was no light, though there was a switch, and maintained that was not an anchor light on the mast and so there was no obligation to repair it. Mr. Sheppard steadfastly maintained that Plaintiffs were wrong in their memory of an anchor light. At the time, there were so many issues on the table, Plaintiffs determined to let this one go in favor of the greater concerns. Plaintiffs now believe the light was stolen at the time of the theft of the winches, and Defendants knew that and had the responsibility of replacing the anchor light.

46)   The sea trial also revealed that the transmitter on the B&G instruments did not work and as a consequence Plaintiffs did not have wind direction, wind speed or boat speed information in the cockpit.  Defendants made numerous attempts to repair the instruments without success.

47)   Plaintiffs continued to meet with Tony Shepherd with regard to the many problems, and the fact that a meaningful sea trial could not be conducted. Plaintiffs were particularly concerned with the danger of overcharging and

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

12 of 33

the expense and danger of the loss of the new gel-cell

batteries as installed by the Defendants, and so advised Tony

Sheppard. However, as the balance of the summer passed and a

few repairs were attempted elsewhere on Gael, the

overcharging problem was not addressed. Defendants were aware

Plaintiffs planned on moving Gael to Annapolis, Maryland,

under her own power beginning on September 13, 2002.

Defendants were also aware that further sea trials were

impossible with the overcharging and bilge pump problems.

48)   Finally, on September 10, 2002, Tony Shepherd sent Paul, a

mechanic from Needham's, over to look at the problem of over-

charging.  Paul adjusted a setscrew on the voltage regulator

and said the problem was cured.  He also said the voltage

regulator was old, had been under water, and should be

replaced, but, most coincidently, due to the impending

departure, there was not time to do so before Plaintiffs'

departure.

49)   Paul further represented that the regulator would be

satisfactory until the Plaintiffs reached Annapolis, and that

if necessary, Plaintiffs could adjust the regulator by

turning the setscrew that he had adjusted and that he had

shown them how to adjust.

50)   Though at this juncture, Plaintiffs were not aware of the

extent of the Defendants' breach of contract, negligence,

gross negligence or willful and wonton misconduct, they
determined, based on Paul's representations that electric
power could be maintained, not only that the coming winter
and their schedule required that they proceed, but also that
the ineptitude of the Defendants was of such a magnitude that
they must seek a repair facility with the ability to repair
the many then apparent problems, and so, with a somewhat
crippled boat, and relying on backup systems, Plaintiffs
started for Annapolis.

51)   By the end of the first day after Plaintiffs departed for
Annapolis, the over-charging resumed, and attempts to adjust
the voltage regulator by turning the setscrew had no effect.

52)   At the time of voltage regulator failure, Plaintiffs were
on an overnight voyage in the middle of a stormy Lake Erie on
the way to Buffalo, New York and had little option but to
continue.

53)   After arriving in Buffalo, and docking at the entrance to
the Erie Canal, the Plaintiffs contracted with and paid Smith
Brothers Marina in Buffalo to replace the voltage regulator.

54)   During the course of the replacement of the regulator, it
was discovered that the three battery switches located on the
end of the galley cabinet were so sloppily wired that some of
the large 02 wiring was within fractions of an inch from the
alternator pulleys. One 02 wire was in fact caught in the

pulley in the course of the replacement of the regulator, and required temporary repair.

55)   A couple of days into the Erie Canal, the new voltage regulator that had been installed in Buffalo was also shorted by the defective wiring as installed by the Defendants.   A second new voltage regulator was installed by a mechanic at Brewerton Boat Yard.

56)   While installing the second new voltage regulator, the Brewerton Boat Yard mechanic discovered that the three main house batteries were not, in fact, gel cells, but rather were much less expensive wet acid batteries.   He also advised Plaintiffs that overcharging had significantly damaged the batteries.   He further advised that the two engine start batteries were, in fact, gel cells, (resulting in two battery types in one system, a forbidden practice).   He noted that the engine start batteries were also badly damaged from overcharging.

57)   The Brewerton Boat Yard mechanic also discovered that several electrical connections were loose, and some were barely connected, creating leakage, static electricity and potential for shorts and significant equipment damage.   The 300-amp fuse that protects the house bank had in fact blown. All connections that the mechanic could reasonably reach were

tightened, and the 300-amp fuse was replaced. The Plaintiffs paid for these services, and moved on.

58) During the course of the trip, Plaintiffs discovered that in spite of Defendants' "repair", as set forth in their invoices, the radar was not working. Defendants had in fact "patch" taped a connection to the antenna lead that must be soldered to work properly. The "patch" was an attempt to temporarily hold the connection together and avoid proper repair, a careless and dangerous act. The plaintiffs determined that the best alternative for a proper repair facility for the radar was Annapolis, and so determined to proceed to Annapolis for repair.

59) Though Plaintiffs waited for a proper weather window before entering the Atlantic Ocean, as a result of the failure to properly repair and test the radar, as alleged above, the Plaintiffs were without radar for the ocean crossing from New York to the Delaware Bay, the Delaware Bay crossing and the Chesapeake Bay crossing.

60) After Plaintiffs arrived in Annapolis and replaced the misrepresented and damaged batteries in both banks with new gel-cells, it was discovered that the charger that had been installed by Defendants was 1) an old style ferrostat charger and not a current state of the art "smart" charger as Plaintiffs had requested, and 2) was not adequate to bring

the batteries to their maximum as specified by the manufacturer of the batteries.

61) The improper charger was replaced with a "smart" charger that will bring the batteries to their specified level and the replacement paid for by Plaintiffs..

62) After arriving in Annapolis, Plaintiffs contacted Miles Witt of Miles Electronics in Ft. Lauderdale, Florida, a known B&G expert, and determined from his advice that the Defendants had not properly reinstalled the master board in the B&G unit. Plaintiffs disassembled the unit, reinstalled the board, and corrected the problem.

63) After arriving in Annapolis, Plaintiffs had the damaged wire that had been discovered in Buffalo replaced, and they then undertook the job of making the wiring behind the three battery switches safe. Using nylon hangers and straps, Plaintiffs spent a day moving and re-hanging the wiring. During the course of this repair, a second badly damaged 02 wire was discovered abrading on the alternator pulley and that wire was also replaced. In addition, the backs of the three battery switches installed by Defendants were examined and several defects and shorts in the installation of the wire to the switches were corrected.

64) While in Annapolis, the Plaintiffs had the radar antenna connection rewired and properly connected. It was then

discovered that the radar itself was not working. An analysis
was done and it was determined that the magnetron was
defective, and consequently, a new magnetron had to be
purchased and installed.

65)  While in Annapolis, Plaintiffs also disassembled the
entire bilge pump system in an attempt to discover the reason
for the pumps' improper operation, while also searching for
the source of the water that was accumulating in the bilge.

66)  During the inspection of the bilge pumps, and while
running the engine to discover the source of the water,
Plaintiffs discovered that the new exhaust hose as installed
by the Defendants was improperly sized and installed. The
exhaust hose fits over a lip on and is attached to the
muffler which is located in the bilge near the bilge pumps.
The hose was oversize and in addition, Defendants had
installed the hose with substandard, inadequate, hose clamps.

67)  As a result of the defective exhaust hose installation, a
significant amount of diesel exhaust fumes were blowing by
the connection and dispersing throughout the boat.

68)  As a result of Defendants' breach of contract and/or
negligence, Plaintiffs and their guests had been exposed to
diesel exhaust fume poisoning.  That exposure included all
times that the engine was running and for a significant time
thereafter while the fumes remained in the boat. The fumes

were present not only during those times Plaintiffs and their guests were awake, but also every night when the Plaintiffs and their guests were sleeping on Gael. As a result of Defendants' negligence, they were sleeping in the fumes that had been generated during the daily engine operation.

69)  In addition to the diesel fumes, water was blowing by the faulty connection and into the bilge causing the frequent operation of the bilge pumps and stressing the pumps.

70)  The Plaintiffs and their guests spent their days in the cockpit of, and slept on Gael, through the entire 3+-week trip through the Erie Canal in New York, through the Hudson River, the Atlantic, Delaware Bay and the Chesapeake Bay.

71)  The Plaintiffs had otherwise slept on Gael or been aboard during and after engine operation during the one sea trial as well as at other times while Plaintiffs were running the engine while attempting to repair the faulty bilge pumps and otherwise working on Gael.

72)  As a result of the facts alleged above, the Plaintiffs and others have had significant exposure to diesel exhaust fume poisoning.

73)  Diesel exhaust fumes are a known carcinogen, and in addition, contain carbon monoxide, and as a consequence, have deleterious and debilitating effects on human beings, with as yet undetermined and perhaps undeterminable impact on the

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

Plaintiffs. In addition to the immediate effects of the exposure, the Plaintiffs now fear cancer or other permanent long range effects from such exposure.

74) While checking the bilge pumps, the Plaintiffs also discovered that the large second stage bilge pump was wired backward, as a result of which, if the boat were sinking and the second stage were reached requiring pump-out, not only would the pump not pump out but, when the boat was settling, and its discharge opening settled below the water line, it would pump water into the boat.

75) In the course of this inspection, Plaintiffs also discovered that the clamps on the ceramic shaft seal had not been tightened and were leaking, further adding to the water in the bilge.

76) All of the above repairs were either paid for, or performed by, the Plaintiffs.

77) Following replacement of all batteries and the battery charger, rewiring and remounting the bilge pumps and correcting the ceramic seals, making a temporary repair on the exhaust hose, as well as checking and tightening all wiring and other connections and making numerous other repairs in Annapolis, Plaintiffs engaged friends to move Gael to Fort Lauderdale, Florida.

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

78)   The voltage regulator again failed in the course of the
trip to Fort Lauderdale, and the alternator, which had been
rebuilt and reinstalled by the Defendants, then also failed.
In addition, the 300-amp fuse that protects the house
batteries blew again.

79)   Gael has required significant additional repair in Fort
Lauderdale including, but not limited to, removing,
rebuilding and reinstalling the alternator, additional
rewiring, replacing the oversized exhaust hose, another new
300-amp fuse, and more.

80)   The electrical system failures as outlined above
necessitated constant generator operation throughout the move
from Michigan to Florida, with the related costs and hours on
the generator.

81)   Plaintiffs learned that the newly employed electrician the
Defendants' had represented would do the
electrical/mechanical repairs on Gael had left Defendants'
employ after a very short time, if he ever worked there at
all, and such person had in fact never worked on Gael. As a
result, the electrical and mechanical work done on Gael was
not done by competent electricians or mechanics.

82)   Pursuant to the parties' contracts for storage, Defendants
had a duty to store Gael indoors during the winter months of

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

2001-2002 and to prevent damage and/or theft of the items entrusted to Defendants.

### Count I -- Breach of Contract

83)  Plaintiffs restate the above paragraphs as if fully set forth herein.

84)  Plaintiffs and Defendants entered into a series of contracts for the repair of Gael.

85)  The Defendants' conduct and misrepresentations are so egregious as to entitle Plaintiffs to the reasonable rental value of Gael for the time they were prevented from using the vessel.

86)  Gael has a rental value of $4000.00 a month, and accordingly, Plaintiffs' loss of use of Gael as a sailing vessel for the summer of 2001 and 2002 due to faulty and untimely repairs, failure to repair, and missing winches and electrical and mechanical problems, and other breaches of contract and negligence by Defendants, has a reasonable value of $24,000.00.

87)  Defendants breached their duty to Plaintiffs by failing to properly store and protect Gael and its component parts.

88)  Defendants further breached their duty by failing to timely replace items stolen while Gael was in their custody and control.

89) As a result of Defendants' complete failure to fulfill their duty to Plaintiffs with regard to the storage and safekeeping of Gael, Plaintiffs have suffered damages.

90) Pursuant to the parties contracts for repair, Defendants had a duty to conduct repairs in timely fashion and to repair and upgrade the mechanical and electrical systems of Gael in accordance with the standards in the maritime industry.

91) Defendants breached their duty to Plaintiffs by failing to properly repair and upgrade the mechanical and electrical systems of Gael.

92) As a result of Defendants' complete failure to fulfill their duties to Plaintiffs with regard to the repair of Gael, Plaintiff has suffered damages, including, but not limited to, the following:

      (a) The cost of additional repairs to the electrical and mechanical systems when such repairs were the responsibility of the Defendants;

      (b) the cost of purchasing and installing equipment to replace defective and/or incorrect equipment used by Defendants;

      (c) harm suffered by the Plaintiffs as a result of exposure to diesel exhaust fumes, diesel exhaust fume poisoning and carbon monoxide poisoning;

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

(d)  Plaintiffs' reasonable fear of cancer or other,
similar disease resulting from the sickness and
harm suffered by Plaintiffs following their
exposure to diesel fumes, including carbon
monoxide, as a result of the negligence of
Defendants;

(e)  loss of use and enjoyment of Gael for 2001 and
2002, as well as payments made to Defendants for
inside storage and dockage, which payments did
not benefit Plaintiffs pursuant to the agreement
with Defendants, resulting in a lack of
consideration to Plaintiffs; and

(f)  such other damages as are pled or as are
discovered throughout the course of discovery in
this matter.

### Count II -- Fraud

93)  Plaintiffs restate the above paragraphs as if fully set
forth herein.

94)  New gel-cell batteries had allegedly been installed on
Gael as reflected in invoice #0024 from the Defendants. In
fact, the Defendants' knowingly, and with fraudulent intent
substituted wet acid batteries for the gel-cells for which

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

they charged, while pocketing the difference in price and
defrauding both the Plaintiffs and their insurance carrier.

95)  The above referenced invoice was submitted to the
insurance carrier and to the Plaintiffs, and gel-cell
batteries were paid for by the insurance carrier, and hence,
the payment therefore was fraudulently obtained by these
Defendants.

96)  Defendants represented that they had the expertise and
ability to properly repair and upgrade the mechanical and
electrical components of Gael, and that they had hired the
additional personnel necessary to enable them to do so.

97)  Defendants' representations regarding the ability to
repair the vessel were false.

98)  Defendants made such representations knowing they lacked
the skill and expertise to properly repair and rewire the
electrical/mechanical components on Gael.

99)  Defendants made the representations knowing that
Plaintiffs would rely on the representations and discontinue
their search for a competent electrician/mechanic to perform
the necessary repairs and upgrades on Gael.

100) Plaintiffs did in fact rely on Defendants' representations
that they had hired competent personnel and that they could
and would competently and professionally perform the repairs
and improvements on Gael and Plaintiffs therefore entrusted

the work to the Defendants based upon Defendants representations.

101) Plaintiffs relied on all of the representations as made by Defendants, and as set forth above to the Plaintiffs'.

102) Plaintiffs have suffered damages as a result of Defendants' fraudulent conduct including, but not limited to, the following:

      (a)   the cost of purchasing all new gel-cell batteries and installing same, including the removal of the wet acid batteries fraudulently installed by the Defendants;

      (b)   the cost of and the time spent re-repairing repairs made by the Defendants as well as making additional repairs to the electrical and mechanical systems, all as occasioned by the breach of contract and/or negligence, misfeasance, willful misconduct, gross negligence and/ or fraud of the Defendants;

      (c)   the cost of purchasing and installing equipment to replace defective and/or incorrect equipment used by Defendants;

      (d)   damages now and into the future resulting from the exposure to diesel exhaust fumes and diesel exhaust fume poisoning;

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

      (e)   loss of use and enjoyment of Gael for 2001 and 2002; and

      (f)   such other damages as are discovered throughout the course of discovery in this matter.

103) Defendants represented that they had installed gel cell batteries, had repaired the transmitter on the B&G instruments, and had installed a "smart" battery charger rather than a ferrostat charger.

104) Defendants' representations regarding the components installed in the vessel were false.

105) Defendants made such representations knowing the components installed in the vessel were not as represented.

106) Defendants made the representations knowing that Plaintiffs would rely on the representations.

107) Plaintiffs did in fact rely on Defendants' representations that the components requested by Plaintiffs had, in fact, been installed on Gael.

108) As a result of Defendants' fraudulent actions, Plaintiffs suffered the damages as set forth above.

### COUNT III -- RESCISSION

109) The Defendants' conduct and misrepresentations are so egregious as to entitle Plaintiffs to rescind the contract and receive a refund of all sums paid Defendants for all such

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

electrical or mechanical repairs or upgrades.  The amount due
Plaintiffs as a result of such rescission is $40,000.00.

### Count IV -- Fraud in the Inducement

110) Plaintiffs restate the above paragraphs as if fully set
forth herein.

111) Defendants represented that the repairs would be made in a
professional and workmanlike manner and that they had the
necessary skill and expertise to properly perform the repairs
on Gael.

112) Defendants materially misrepresented their future conduct
regarding the performance of the repairs knowing Plaintiffs
would rely on the their misrepresentations.

113) Plaintiffs, in fact, relied upon the false representations
made by Defendants and are entitled to rescind the agreement
and recover all amounts paid to Defendants as a result of
Defendants failure to comply with their representations
regarding the repairs and upgrades to be performed on Gael.

114) Defendants have benefited from their misrepresentations by
receiving payment for repairs and upgrades either not
performed or performed in a negligent, careless, and/or
knowingly deficient manner.

**Count V -- Violation of Michigan Consumer Protection Act**

115) Plaintiffs restate the above paragraphs as if fully set forth herein.

116) The Michigan Consumer Protection Act sets forth that unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful. MCLA 445.903.

117) Defendants' actions violated the provisions of the Michigan Consumer Protection Act. The violations include, but are not limited to, the following:

    (a)   representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

    (b)   representing or implying that the subject of a consumer transaction will be provided promptly, or at a specified time, or within a reasonable time, if the merchant knows or has reason to know it will not be so provided;

    (c)   failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;

(d)  loss of use and enjoyment of Gael for 2001 and
2002; and

(e)  such other damages as are elsewhere pled herein
or as are discovered throughout the course of
discovery in this matter.

119) Plaintiffs are also entitled to recover the amount
expended in attorneys' fees and court costs to pursue their
claim under the terms of the Michigan Consumer Protection
Act.

<u>Punitive and Exemplary Damages</u>

120) The absolute carelessness, gross negligence and lack of
regard for the health and well-being of the Plaintiffs as
evidenced in the faulty replacement of the exhaust hose,
thereby exposing Plaintiffs and others to poison diesel
fumes, as well as Defendants' failure to properly install the
electrical system and batteries and bilge pumps, thereby
exposing Plaintiffs to the possibility of a boat that could
lose all power and could flounder and/or sink in conditions
that would otherwise be safe, while creating an appearance of
safety, as well as Defendants' failure to properly repair the
radar by "patch" taping a connection which requires solder,
thereby creating a potential danger of collision or loss of
navigation, all constitute gross negligence and willful and
wanton misconduct. All such actions by Defendants evidence an

POTTER, DeAGOSTINO, CAMPBELL & ODEA

    (d)   gross discrepancies between the oral representations of the sell and the written agreement covering the same transaction or failure of the other party to a transaction to provide the promised benefits; and

    (e)   making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.

118) Plaintiffs suffered injury and damages as a result of Defendants' violation of the Michigan Consumer Protection Act, including, but not limited to, the following:

    (a)   additional repairs to the electrical and mechanical systems;

    (b)   the cost of purchasing and installing equipment to replace defective and/or incorrect equipment used by Defendants;

    (c)   damages associated with the exposure to diesel exhaust fumes and diesel exhaust fume poisoning, as well as Plaintiffs' reasonable fear of future cancer or other disease as a result of such exposure and resultant illness;

absolute disregard for the safety of others in relation to services performed by Defendants that are directly related to such safety and in regard to which Defendants have a special duty. Such actions, and the breach of such duty, posed a severe and extreme threat to the Plaintiffs as well as others aboard Gael. Such conduct caused plaintiffs great harm, and exposed them to far greater harm. Defendants' actions have caused and are causing Plaintiffs great emotional distress as well as continuing concern over the possibility of having been poisoned by diesel fumes and the possibility of cancer or other long-term and potential illness or other deleterious effects of such poisoning. Such concern shall cause distress for years. As a consequence, Defendants should pay actual as well as Punitive and Exemplary damages to Plaintiffs. Further, payment of Punitive and Exemplary damages enforces the social policy discouraging such careless, callous and willful and wonton behavior and as such is a necessary function of the Court.

121) WHEREFORE, Plaintiffs pray for Punitive and Exemplary Damages of $500,000.00 plus actual damages of $500,000.00 plus damages of rescission of $40,000.00 plus damage for loss of use of $24,000.00 for total damages of $1,062,000.00 plus all costs, applicable interest and attorney fees.

A. The Defendants should also pay Punitive damages for the civil and criminal Fraud perpetrated on the Plaintiffs and on Global Marine and American Yachts, Ltd., Plaintiffs' insurance carrier, in charging for gel cell batteries and placing instead liquid acid batteries on Gael. Plaintiffs are entitled to such Punitive and Exemplary Damages as a consequence of the Fraud perpetrated on them.

B. Finally, the many misrepresentations by Defendants and Plaintiffs' reliance thereon, all to Plaintiffs' detriment, entitle Plaintiffs to Punitive and Exemplary Damages.

Respectfully submitted,

Potter, DeAgostino, Campbell & O'Dea

STEVEN M. POTTER (P33344)
RICK J. PATTERSON (P55706)
Attorneys for Plaintiffs
2701 Cambridge Court, Suite 223
Auburn Hills, MI 48326
Dated: June 19, 2003          248-377-1700/248-377-0051 fax

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

RICHARD A. CAMPBELL and
MARY M. CAMPBELL,

     Plaintiffs,

vs.

BRIDGEVIEW MARINA, LTD.,
NEEDHAM'S MARINE, LTD., and
CAPTAIN'S YACHTING SERVICE, LTD.,

     Defendants.

03 - 40164
Case No.

Hon.

MAGISTRATE JUDGE WALLACE CAPEL, JR.

/

Potter, DeAgostino, Campbell & O'Dea
STEVEN M. POTTER (P33344)
RICK J. PATTERSON (P55706)
Attorneys for Plaintiffs
2701 Cambridge Court, Suite 223
Auburn Hills, Michigan 48326
248-377-1700/248-377-0051 fax

/

## DEMAND FOR JURY TRIAL

     NOW COME Plaintiffs, RICHARD A. CAMPBELL and MARY M. CAMPBELL, by

and through their attorneys, POTTER, DEAGOSTINO, CAMPBELL & O'DEA, and hereby

demands a trial by jury in the above-entitled cause.

                    POTTER, DeAGOSTINO, CAMPBELL & O'DEA

                    STEVEN M. POTTER (P33344)
                    DANIEL E. MORRISROE (P38369)
                    RICK J. PATTERSON (P55706)
                    Attorneys for Plaintiffs
                    2701 Cambridge Court, Suite 223
                    Auburn Hills, Michigan 48326
Dated: June 27, 2003         (248) 377-1700

FILED

JUL - 1 2003

CLERK'S OFFICE
U. S. DISTRICT COURT

POTTER, DeAGOSTINO, CAMPBELL & O'DEA