UNITED STATES DISCTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD A. CAMPBELL and
MARY M. CAMPBELL,

        Plaintiffs,

vs.

BRIDGEVIEW MARINA, LTD.,
NEEDHAM'S MARINE, LTD., and
CAPTAIN'S YACHTING SERVICE, LTD.,

        Defendants.

Case No. 03-40164

Hon.: Paul V. Gadola

---

| Potter, DeAgostino, Campbell & O'Dea | D'Luge, Miles, Miles & Cameron, P.L.C. |
|---|---|
| STEVEN M. POTTER (P33344) | BRIAN J. MILES (P37186) |
| RICK J. PATTERSON (P55706) | CHERYL A. CAMERON (P52497) |
| Attorneys for Plaintiffs | Attys for Defs Bridgeview & Captain's Yachting |
| 2701 Cambridge Court, Suite 223 | 67 N. Walnut |
| Auburn Hills, Michigan 48326 | Mt. Clemens, Michigan 48043 |
| (248) 377-1700/(248) 377-0051 fax | (586) 468-7511/(586) 468-7049 fax |

Garan Luco Miller, P.C.
MARK SHREVE (29149)
Attorney for Needham's Marine, Ltd.
1111 W. Long Lake, Suite 300
Troy, Michigan 48098-6333
(248) 641-7600/(248) 641-0222 fax

*(sidebar, vertical text)* POTTER, DeAGOSTINO, CAMPBELL & ODEA

---

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

    NOW COME Plaintiffs, RICHARD A. CAMPBELL and MARY M. CAMPBELL by and

through their attorneys POTTER, DEAGOSTINO, CAMPBELL & O'DEA move this Honorable

Court to deny Defendants, CAPTAIN'S YACHTING SERVICE, LTD., and BRIDGEVIEW

MARIANA, LTD.'s Motion to Dismiss for reasons stated more fully in their attached Brief in

Support.

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

STEVEN M. POTTER (P33344)
RICK J. PATTERSON (P55706)
Attorneys for Plaintiffs
2701 Cambridge Court, Suite 223
Auburn Hills, Michigan 48326
(248) 377-1700

Dated: September 25, 2003

POTTER, DeAGOSTINO, CAMPBELL & ODEA

UNITED STATES DISCTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD A. CAMPBELL and
MARY M. CAMPBELL,

          Plaintiffs,

vs.

BRIDGEVIEW MARINA, LTD.,
NEEDHAM'S MARINE, LTD., and
CAPTAIN'S YACHTING SERVICE, LTD.,

          Defendants.

Case No. 03-40164

Hon.: Paul V. Gadola

---

| | |
|---|---|
| Potter, DeAgostino, Campbell & O'Dea | D'Luge, Miles, Miles & Cameron, P.L.C. |
| STEVEN M. POTTER (P33344) | BRIAN J. MILES (P37186) |
| RICK J. PATTERSON (P55706) | CHERYL A. CAMERON (P52497) |
| Attorneys for Plaintiffs | Attys for Defs Bridgeview & Captain's Yachting |
| 2701 Cambridge Court, Suite 223 | 67 N. Walnut |
| Auburn Hills, Michigan 48326 | Mt. Clemens, Michigan 48043 |
| (248) 377-1700/(248) 377-0051 fax | (586) 468-7511/(586) 468-7049 fax |

*(Left margin, vertical text: POTTER, DeAGOSTINO, CAMPBELL & O'DEA)*

## BRIEF IN SUPPORT OF
## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

                                                                              PAGE

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

STATEMENT OF ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

MOST APPROPRIATE AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

      A.    Forum Non Conveniens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
            1.    Private Interest Factors compel denial of Defendants' motion . . . . . . . .  6
            2.    Public Interest Factors compel denial of Defendants' motion . . . . . . . .  12
      B.    Choice of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
            1.    The place of the wrongful act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
            2.    The law of the flag . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
            3.    The allegiance or domicile of the injured party . . . . . . . . . . . . . . . . . .  14
            4.    The allegiance of the Defendant ship owner . . . . . . . . . . . . . . . . . . . .  15
            5.    The place of the contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
            6.    The accessibility of a foreign forum . . . . . . . . . . . . . . . . . . . . . . . . .  15
            7.    The law of the forum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
            8.    The ship owner's base of operations . . . . . . . . . . . . . . . . . . . . . . . . .  16

RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

i

## INDEX OF AUTHORITIES

**Federal Cases**                                                            **Page(s)**

Hellenic Lines, Ltd. v. Rhoditis,
398 U.S. 306 (1970) ........................................................ 13

Lauritzen v. Larsen,
345 U.S. 571 (1953) ........................................................ 13

Norfolk & Western Railroad Company v. Ayers,
--US--, 155, L.Ed. 2d 261, 123 S.Ct. 1210 (2003) ................................. 5

Piper Aircraft Company v. Reyno,
454 U.S. 235, 242 (1981) ..................................................... 5

Stewart v. Dow Chemical Co.,
865 F.2d 103, 05 (6th Cir. 1989) ........................................... 4,12

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

## STATEMENT OF ISSUE PRESENTED

I.      SHOULD DEFENDANTS' MOTION TO DISMISS PURSUANT TO THE
DOCTRINE OF FORUM NON CONVENIENS BE DENIED?

                Plaintiffs state: "YES".
                Defendants state: "NO".

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

iii

## MOST APPROPRIATE AUTHORITY

Piper Aircraft Company v. Reyno, 454 U.S. 235, 242 (1981), holds that a plaintiffs choice of forum must be given great deference unless the plaintiff is foreign to the jurisdiction. Piper Aircraft also requires a defendant seeking dismissal based on forum non conveniens to demonstrate that an alternative forum is available for plaintiffs claims. In addition, Defendant must demonstrate that the public and private factors involved in the case favor dismissal.

Lauritzen v. Larsen, 345 U.S. 571 (1953) and Hellenic Lines, Ltd. v. Rhoditis, 398 U.S. 306 (1970), set forth the factors to be considered when determining the applicable law in a maritime action. The factors are:

1. The place of the wrongful act;
2. The law of the flag;
3. The allegiance or domicile of the injured party;
4. The allegiance of the Defendant ship owner;
5. The place of the contract;
6. The accessibility of a foreign forum;
7. The law of the forum; and
8. The ship owner's base of operations.

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

iv

## INDEX OF EXHIBITS

Description                                                                    Exhibit No.

Plaintiffs' Voter Registrations ................................................... 1

Certificate of Documentation ..................................................... 2

Bridgeview Marina Contract ...................................................... 3

Customs Collection Receipt or Informal Entry ..................................... 4

Canada Customs Report .......................................................... 5

Plaintiffs' Verified Complaint .................................................... 6

Sea Trial Report of Mike Thompson with attached comments by Plaintiffs ............ 7

General Occurrence Report ....................................................... 8

Total Power Contract ............................................................ 9

Correspondence from Andrew Bumstead and Richard Campbell's correspondence to Tony Shepherd ...................................................................... 10

Portion of billings to Plaintiffs from Defendants ................................. 11

Captain's Yachting Services invoice of August 2, 2002 ............................ 12

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

**Factual Background**

Plaintiffs, both lifelong U.S. citizens and lifelong Michigan residents, purchased the sailing vessel, Gael, a Mason 44, in the spring of 1999 (Exhibit 1, Plaintiffs' voting registrations, as evidence of citizenship and residency). Gael was purchased in the name of a Delaware corporation that is wholly owned by the Plaintiffs in anticipation of moving aboard and sailing her to the Virgin Islands and offering day charters. The corporate name is Caribbean Vacations Ltd. Upon purchase, Gael was documented with the United States Coast Guard as a U.S. vessel. Because of its accessibility to the Chesapeake Bay, and the Atlantic Ocean, yet but a days drive from Michigan, it was determined to make Philadelphia, Pennsylvania her hailing port (Exhibit 2, copy of original Certificate of Documentation). Before taking possession of Gael, Plaintiffs contacted Bridgeview Marina concerning a berth for Gael. Bridgeview had been recommended by friends of Plaintiffs' who were familiar with the marina, or who kept their boat there. Bridgeview is on the Canadian side of the Blue Water Bridge, across from Port Huron, Michigan, and is less than a mile from the Michigan shore and a couple of hundred yards from Michigan waters. Bridgeview's location seemed ideal to Plaintiffs because it is close to Metro Detroit and the closest available marina to Lake Huron, where Plaintiffs intended sailing for the next couple of years while getting used to Gael. The sailing time on Lake Huron was also intended to make sure she was properly equipped for the islands, and to become entirely familiar with her systems, while otherwise getting ready for the move.

Plaintiffs visited Bridgeview and learned that a large percentage of the boat owners in the marina were from the U.S. In fact, Plaintiffs were told at least 8 of the 10 boats on the finger pier last occupied by Plaintiffs were U.S. boats. A contract was signed for a berth at Bridgeview

1

(Exhibit 3).  Gael was registered with the U.S. Coast Guard/U.S. Customs as a U.S. boat with authority to operate in Canadian Waters (Exhibit 4, Customs receipts). She was also registered with Canadian Customs as a U.S. boat with authority to be in Canada (Exhibit 5, Canadian Customs Report).   Contrary to Defendants' claims, they were provided with a copy of this documentation.

Seventeen months later, on September 1, 2000, while on a sailing trip around Lake Huron, Plaintiffs went aground outside the Lexington, Michigan. Gael was holed in the grounding, and took in substantial water. Pumps were brought in with the hope of keeping her as dry as possible, but it was essential that once she was pulled from the shore, she would be hauled as quickly as possible. However, it was also a consideration that once hauled, her hull be repaired without her being moved again and subjected to further damage. Plaintiff Richard Campbell contacted Tony Shepherd, the manager of Bridgeview's Captain's Yachting Service facility, and discussed the damage to Gael and hull repairs that would be necessary. It was agreed that Gael would be towed to Bridgeview and hauled immediately to avoid further damage, and for a discussion regarding repairs. At this point, Plaintiffs had little hesitation with regard to the fiberglass hull repairs because of Bridgeview's reputation for fiberglass repair. Plaintiffs had in fact observed fiberglass boats from all over the United States in the repair facility at Bridgeview for fiberglass work and had noticed the quality of the hull work was excellent. Prior to the grounding, when Plaintiffs had, out of curiosity, queried of Marina employees and boaters in the Marina about the number of U.S. boats being repaired at Bridgeview, they were told that, because of the Marina's reputation for fiberglass repair, boats were brought there from all over the world, but particularly from the U.S.

As expressed in Plaintiffs' Complaint, paragraph 13 and following, (Exhibit 6, verified copy of Plaintiffs' Complaint) Plaintiffs had reservations about Bridgeview's ability to repair the electrical and mechanical damage. In fact, as set forth in Plaintiffs' Complaint, Plaintiffs had arranged to hire a recognized electrical/mechanical expert to do the repairs, but in the course of negotiating the contract for repair, Bridgeview steadfastly maintained that they would not allow Plaintiffs' expert electrician/mechanic access to the Bridgeview yard (Exhibit 6, Para 13.) Instead, Bridgeview, in the person of Tony Shepherd, addressed Plaintiffs' concerns by advising Plaintiffs that it had hired an expert electrical engineer with additional mechanical expertise to do all the electrical and mechanical work on Gael.

Based on Tony Shepherd's representations, Plaintiffs contracted with Defendants. The estimated date for completion of the repairs was late June, 2001. The summer of 2001 came and went with repeated excuses from Tony Shepherd until, finally, in October of 2001, Tony Shepherd contacted the Plaintiffs and advised that Gael was ready for sea trial. The sea trial was premature and disappointing. It was obvious that Tony Shepherd had not checked Gael after his yard workers had worked on her (Exhibit 7, report of Mike Thompson, Marine Surveyor retained by Plaintiffs, with attached comments by Plaintiffs. Also see Exhibit 6, Para. 21). Finally, in June of 2002, 21 months after taking possession of Gael for repairs, and after numerous additional delays and excuses, Defendants' finally delivered Gael to the Plaintiffs.

Soon after taking possession of Gael in June of 2002, Plaintiffs discovered that the work was still not complete, and there were significant problems with the work that had been done. In addition, three winches and one halyard were missing from Gael's mast, and so she could not be sailed. Plaintiffs had not been advised of the theft (Exhibit 8, a police report as file by the

3

Defendants concerning the theft of the winches and halyard while the mast was in their possession as a part of the repair).  The Plaintiffs spent the balance of the summer of 2002 waiting for the winches, conducting one sea trial, and then trying to convince the Defendants that they should finish the still unfinished work on Gael. Defendants were well aware that Plaintiffs intended moving Gael to Florida in September of 2002, as that had often been discussed with them in the continued effort to convince them to finish their work on Gael (Exhibit 6, Paras. 35-48).  On September 13, 2002, convinced that Defendants were not going to correct their errors and finish their repairs, the Plaintiffs sailed Gael out of Bridgeview into the St. Clair River and pointed her south. As plaintiffs had feared, the trip was fraught with electrical, electronic and mechanical problems.

It must be noted that the time periods in Defendants' brief are in error. As indicated above, Gael was in Bridgeview 17 months prior to her grounding, not "several years" as indicated by the Defendants. Also, she was moved to Florida between September and December of 2002, and has been there 9 months, not two years. Moreover, Plaintiffs are not residents of Canada. Plaintiffs own a vacation condo in Whistler, British Columbia, Canada, where they spend part of their winter on ski vacation.

### Argument

A trial court's decision regarding a motion to dismiss based on the doctrine of forum non conveniens must be upheld in the absence of a clear abuse of discretion.  Stewart v. Dow Chemical Co., 865 F.2d 103, 105 (6th Cir. 1989).  In an effort to support the instant motion, the Defendants claim that "the allegations set forth in Plaintiffs' Complaint relate to the circumstances surrounding the repair work performed over the next year and a half by Captains." The real issue

4

is not the, "circumstances surrounding," the repair work, but rather it is the <u>consequence of</u> Captain's faulty repair work, failure to repair, negligence, fraud and misrepresentation. Despite the fact that this action is pending in Federal Court, Defendants improperly compare ties with Canada versus Michigan rather than comparing ties with U.S. versus Canada. As set forth below, the consequences of Defendants actions were manifested in the United States.

## A.     Forum Non Conveniens

The Plaintiffs' choice of forum deserves substantial deference because Plaintiffs are U.S. citizens. <u>Piper Aircraft Company v. Reyno</u>, 454 U.S. 235, 242 (1981). A defendant moving for dismissal on forum non conveniens grounds must first demonstrate the availability of an adequate alternative forum.  <u>Stewart</u> at 106.  Defendants claim that Ontario, Canada offers a viable alternative forum for Plaintiffs' claims.  While the Canadian courts may provide a remedy for Plaintiffs' breach of contract and fraud claims, Plaintiffs would not be afforded a remedy regarding the claims under the Michigan Consumer Protection Act or their tort claim regarding exposure to toxic fumes (See <u>Norfolk & Western Railroad Company v. Ayers</u>, --US--, 155 L.Ed. 2d 261, 123 S.Ct. 1210 (2003)). The court in <u>Piper Aircraft</u> stated that where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative and the initial requirement may not be satisfied.  <u>Piper Aircraft</u> at 254.  Asking Plaintiffs to sacrifice a portion of their claims makes the Ontario Courts an inadequate and unsatisfactory forum.  Having failed to satisfy the initial requirement regarding an adequate alternative forum, Defendants' motion must be dismissed.

1.      Private Interest Factors compel denial of Defendants' motion

Not only do Defendants fail to demonstrate a adequate alternative forum, the factors considered when evaluating Defendants' motion also support the denial of Defendants' motion. The private interest factors to be evaluated include:

1.      The relative ease of access to sources of proof;

2.      The availability of compulsory process for obtaining attendance of witnesses;

3.      The cost of obtaining attendance of witnesses;

4.      The possibility to view the premises, if appropriate;

5.      Other practical problems that make trial easy, expeditious and inexpensive.

6.      Problems of enforcing a judgment if one is obtained.

Stewart at 106.

The sources of proof in this matter will come from the parties themselves and the entities involved in the repairs at issue. Defendants incorrectly assert that this factor favors proceeding in Ontario. The repairs performed by Defendants are not at issue because Defendants have control over those aspects of proof. As discussed more fully below, when analyzed, Defendants' reliance on the fact that Canadian subcontractors performed some of the repair work does not support dismissal because the majority of that work is not at issue in this case. More importantly, the sources of proof regarding the repairs that were necessary after Defendants delivered GAEL to Plaintiffs are found in the United States and would not be subject to compulsory process in Canada. Lastly, There is no need to view the premises in this matter and Defendants concede that the enforceability of a judgment is not an issue in this case.

6

The repeated and extensive repairs that occurred after Plaintiffs left Defendants marina all took place in the United States, and the Plaintiffs intend calling at least the following witnesses, all of whom are subject only to U.S. process:

1. Mechanic or Service Manager, Smith Boys Marine, North Tonawanda, NY, regarding the installation of a replacement voltage regulator replacing the faulty regulator left in Gael by the Defendants. Also with regard to the scattered manner in which the wiring had been installed, and with regard to the short of one of the main positive leads into the alternator pulley.

2. Manager, West Marine, Buffalo, NY, regarding the purchase of a new voltage regulator to replace the faulty regulator, and the purchase of large amp fuses to replace those that had blown as a consequence of the faulty wiring.

3. Mechanic or Service Manager, Brewerton Boat Yard, Brewerton, NY, regarding the continuing electrical problems. Noted that the recently installed voltage regulator was now blown. Also noted that the batteries were not gel cells as represented to Plaintiffs by Defendants, but were in fact cheap wet cell batteries, and also that they were now significantly damaged due to over charging because of the lack of proper regulation.

4. West Marine, Harrison Twp, Michigan, regarding the purchase of another new regulator sent to the Plaintiffs by Greg Doty.

5. Deka Batteries, Sterling Heights, MI, regarding the purchase of four glass mat batteries to replace the destroyed wet cell batteries as fraudulently installed by the Defendants.

POTTER, DeAGOSTINO, CAMPBELL & ODEA

6. Defender Industries, Waterford, CT, regarding the sale of a Zantrex Truecharge 40+ to replace the faulty charger as installed by the Defendants.

7. West Marine, Annapolis MD, regarding the sale of sensors for the Truecharge 40+, as well as other supplies.

8. Electronic Marine, Inc, Annapolis, MD, regarding the Defendants failure to repair the radar and Electronic's repair of same.

9. Fawcett Boat Supplies, Annapolis, MD, regarding the sale of miscellaneous materials necessary to the continued repair of electrical and mechanical defects in Gael's systems due to improper installation/repair by Defendants.

10. Steve's yacht Repairs, Inc, Annapolis Harbor Boat Yard, Annapolis, MD, regarding repairs made to electrical system and radar, continuing to correct Defendants' faulty work.

11. Greg Doty, Birmingham, MI, regarding purchase, delivery to Plaintiffs in Maryland, and installation of approximately 700 LB of new glass mat batteries to replace the destroyed wet cells as fraudulently installed by Defendants.

12. Jim Gie, Webberville, MI, regarding the replacement of wet cells with gel cells.

13. John and Mickey Anga, Lapeer, MI, regarding their temporary repair of the leaking exhaust system, the extent of the exhaust leak into Gael, and the continued failures in the electrical system on the trip from Annapolis to Fort Lauderdale, FL.

14. Miles Witt, Fort Lauderdale, FL, regarding repair of the failed B & G system on Gael.

15. Ray Eaton, Ray Eaton Yacht Services, Fort Lauderdale, FL, regarding his review of the entire electrical system and exhaust system aboard Gael, his determinations, and the extensive repairs as made by him to both systems

16. West Marine, Fort Lauderdale, FL, re purchase of repair parts for Gael.

Another consequence is the damage and personal harm suffered by the Plaintiffs, Richard and Mary Campbell as a result of their exposure over several months to diesel exhaust fumes, a known carcinogen, and the related carbon monoxide. The Plaintiffs intend calling at least the following persons with regard to this claim.

1. Greg Doty, Birmingham, Michigan

2. John and Mickey Anga, Lapeer, Michigan

3. The Plaintiffs and such other persons as are determined to be necessary to the support of the claim.

Contrast Plaintiffs' witnesses, nearly all of whom are strangers to the Plaintiffs and therefore will quite likely will require service of process to testify, with Defendants' list and the first thing that stands out is Defendants' list is comprised of suppliers who have a continuing relationship with the Defendants, and have every reason to cooperate with them. To suggest otherwise is to belie common sense and ordinary commercial motivation and behavior.

As mentioned above, most of those on the list of suppliers and subcontractors supplied by the Defendants as an attachment to their Exhibit 2, (attached to their Brief under Exhibit B), in support of their Motion, have little relevance to this cause. The allegations in Plaintiffs' Complaint involve specific electronic, electrical and mechanical failures, omissions, and failed repairs. But

the majority of the, "17 different Canadian entities," listed were not and are not involved in the areas in which the failures, omissions, or failed repairs occur. (There are actually 18 entities on the list, but one, #5, is correctly identified as located in Michigan.) Specifically, with regard to Defendants' list, there are no allegations in the Complaint that involve the following items on Defendants' list: the Auto Pilot, the hoses hardware, etc, the float switches (though Needham Marine is a defendant in this lawsuit and their cooperation should not be a problem), the VHF repair, the bow thruster, the pumping out of holding tank, the radio and CD player, the sandblasting, the upholstery, the fuel filters, etc, the repairs to drive shaft, or the repairs to cabin heater and information for stove & lighter. As a consequence, 12 of the 17 listed suppliers, (#s 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17 and 18) are not involved in the areas of breach as alleged in Plaintiffs' complaint and have nothing to contribute in support of or in defense of this lawsuit. Of the remaining 5 suppliers on the list, hereafter referenced by their number on Defendants' list, the contract with #12, Total Power, for the engine overhaul was negotiated by the Plaintiffs. (Plaintiffs' Exhibit # 9.) Defendants were responsible for removal and reinstallation; #1, Exide Technologies is a U.S. company with its main office at 210 Carnegie Center, Princeton, NJ, phone: 609.627.7200; #2, BAE Systems is a U.S. company with its home office at 1601 Research Blvd, Rockville, MD, phone: 301.838.6000.

Defendants' contracts with #3, Electro Marine Co. and #4, Short Wave Electronics was not authorized by the Plaintiffs and/or their insurance carrier, as neither of them are manufacturers of the electronics they were servicing as required by their contract. (Exhibit 10, letter of March 6, 2001 from Andrew Bumstead of American Yachts to Richard Campbell and Richard Campbell's letter of May 29, 2001 to Tony Shepherd, manager of Captain's Yachting Service requiring that

10

the electronics be returned to the manufacturers.) As such, it's probable that they will have nothing to add on Defendants' behalf, and certainly, Defendants cannot turn their breach to a benefit.

It is now obvious that Defendants intended to breach of contract while hiding that breach from the Plaintiffs. The Defendants, in their billings to Plaintiffs provided a list of subcontracts that did not identify the subcontractors. (Exhibit #11, a portion of the billing provided to Plaintiffs by Defendants.) Plaintiffs were not aware of this breach of contract by Defendants until receipt of this Motion.

Defendants, in their brief, state that the Plaintiffs had the, "option" of taking their boat elsewhere, (page 1, line 5), and that Plaintiffs, "could have chosen to have the vessel repaired anywhere," (page 11, line 16), while ignoring the fact that the decision to have the electrical and mechanical work done at Bridgeview was based entirely on Tony Shepherd's representations that Bridgeview had hired an electrical engineer with mechanical skills. Plaintiffs' "option" or "choice" had been significantly influenced, and was in fact determined, by Tony Shepherd's representations. It was not until Gael was delivered back to Plaintiffs that Shepherd disclosed that the "engineer" had left their employ without ever working on Plaintiffs' boat, and the additional fact that the electrical and mechanical repairs had been performed by the regular yard employees. The work was not done by an electrician or mechanic. Had the Plaintiffs known of this change, they would have had Bridgeview complete the hull repair and when she could be towed, taken Gael elsewhere for the electrical and mechanical work. Defendants' misrepresentations interfered with Plaintiffs' decision making process, were intended to and were in fact the cause of significant damages and harm to Plaintiffs. The repairs about which the Plaintiffs were so concerned, and

11

about which the Defendants misrepresented their intent and capacity, are the very repairs with regard to which the Defendants so miserably failed.

### 2.   Public Interest Factors compel denial of Defendants' motion

The second set of factors to be analyzed by the Court have been labeled public interest factors and include:

1.   The administrative difficulties flowing from further court congestion;

2.   The burden of jury duty on people of a community having no connection with the litigation;

3.   Desirability of holding a trial near those most affected by it; and

4.   Appropriateness of holding a trial in a court, which is familiar with governing law.

Stewart at 106.

Analysis of the above public interest factors also favors denying Defendants' motion. This case will not pose any administrative difficulty due to court congestion. There is no support for Defendants contention that this case proceeding in U.S. Federal Court will result in a flood of litigation by U.S. citizens against Canadian companies. Furthermore, Plaintiffs believe U.S. law applies to the present controversy so this Court is best able to resolve the matter. The jury pool that will decide this issue has a strong connection with this litigation. Plaintiffs are Michigan residents and are members of the very community from which potential jurors will be selected. Defendants' assertion that this matter has virtually no connection with Michigan is absurd. The real parties in interest are Plaintiffs, who are Michigan residents suffering the effects of being

12

poisoned by Defendants' faulty repairs and who are the sole owners of the corporation that held title to GAEL.

**B.    Choice of Law**

Defendants set forth eight factors utilized by the Supreme Court in determining what law to apply to a maritime claim.  Lauritzen v. Larsen, 345 U.S. 571 (1953) and Hellenic Lines, Ltd. V. Rhoditis, 398 U.S. 306 (1970).  While these factors deal principally with the choice of law, they also bear significantly on the issue of contacts with the forum, and consequently, on the choice of forum.  Each factor is addressed below:

1.The place of the wrongful act.

While the negligent repair work took place in Canada, as pointed out above, the damage that flowed from that negligence, and from the initial breach of contract, occurred almost totally in the United States. The Defendants were well aware that the Plaintiffs were intending to depart Bridgeview for Florida in Mid September of 2002, and that the trip was down through the Great Lakes, the Erie Canal, the Hudson River into the Atlantic and the Chesapeake, with a layover in Annapolis. This plan was discussed with the Defendants' representatives often as the Plaintiffs pressed the Defendants to repair the obvious defects in their repair work. As can be seen, the route is entirely in the United States (with the possible exception of an intrusion into Canadian waters). Though there was exposure to fumes while in Canada, this trip was done almost exclusively under power, and consequently, it was during the weeks of this trip that the Plaintiffs unknowingly lived in the diesel fumes and attendant carbon monoxide that resulted from the Defendants' faulty exhaust system repair. It was also on this trip that the breakdowns from the Defendants' faulty

13

repairs, failures to repair and refusal to repair occurred. The consequences of Defendants' wrongful acts were manifested in the United States, and were suffered, and are being suffered there.

### 2. The law of the flag.

Gael is a United States vessel (Exhibits 2, 4, and 5). No question exists regarding this fact. Defendants offer no support for their contention that this factor should be given nominal emphasis.

### 3. The allegiance or domicile of the injured party.

As demonstrated above, Gael is a U.S boat, Caribbean Vacations Ltd a U.S corporation and the Campbells U.S. citizens. In spite of Defendants' protests to the contrary, this is and was no surprise to them. A copy of the Canadian Customs Report for Gael has already been introduced as Exhibit #5. A copy of this report was provided Bridgeview each year on renewal. Note that the U.S. Coast Guard number is clearly indicated over "Conveyance Reg. No." Also note that, contrary to Defendants' assertions, the owner is listed as, "Caribbean Vacations Ltd. of Dover DE". In addition, the initial contract with Bridgeview, already an exhibit, clearly shows the 1999 Michigan address of the Campbells. As directed by Bridgeview personnel, the contract was entered into by the Campbells as, "agent with authority of the owner of the boat." Exhibit #12, Captain's Yachting Services invoice of August 2, 2002, #113079, clearly shows that, as late as the last full month that Gael was in Bridgeview, and the Campbells were aboard, Captain's staff were aware that the Campbells residence was in Michigan. Further, that same invoice has written in the lower right corner, "U.S. Boat on Permit Exempt", an additional acknowledgment by Bridgeview

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

14

that Gael is a U.S. vessel in Canada on a temporary permit. The real parties in interest are Michigan residents and this factor favors denying Defendants' motion.

### 4. The allegiance of the Defendant ship owner.

This standard appears to presume a suit against a vessel, which obviously is not the case here. However, to the extent that the ownership of the ship determines the proper forum, again, that forum is the U.S.

### 5. The place of the contract.

As stated above, the contract negotiations took place by phone between Michigan and Ontario, and on the ground at Bridgeview. This factor does not appear to weigh heavily in favor of either party.

### 6. The accessibility of a foreign forum.

As previously stated, a foreign forum is accessible for some of Plaintiffs' claims, however, compelling Plaintiffs to seek redress in Ontario would force them to sacrifice relief for claims that recognized in this forum that are unavailable in Ontario. Because Plaintiffs would be forced to sacrifice a portion of their claim in a foreign forum, this factor favors denial of Defendants' motion.

### 7. The law of the forum.

Though this query may be inapplicable when a defendant is involuntarily made a party to an action in the U.S., Plaintiffs would nevertheless argue that, because of the significant U.S. ties,

the only law that should apply to this cause is the law of the United States, and it would be illogical to send the case to Canada for the application of U.S. law.

### 8. The ship owner's base of operations.

Again, Gael is a U.S. vessel. Her hailing port is Philadelphia, Pa. Her owner is a U.S. corporation. That corporation is owned by U.S. citizens and Michigan residents. She sails under a U.S. Customs permit. She was not in Canada as a Canadian boat, but rather she was there under a temporary permit that must be renewed annually and provides that the permit will be revoked if, 1) she is used by a resident of Canada, 2) she is sold or otherwise disposed of in Canada, 3) she is used for the transport of persons or goods for hire or reward or the transport of goods for sale, 4) not exported from Canada within the period in respect of which the permit was issued or renewed. She was located at Bridgeview under those very restrictive conditions for only 17 months, less her time at sail, prior to her grounding. It seems obvious that her base of operations (i.e. the court and the law that should apply to her) is U.S.

Defendants improperly alter this factor to focus on the Defendants' base of operations rather than the ship owner's base of operations. Because they have applied the wrong analysis of this factor, Defendants' assertions regarding the last factor should be ignored.

In summary, Gael is a U.S. ship. Her contact with Canada was pursuant to a U.S. Customs permit, and a Canadian Customs permit. The Campbells are U.S. citizens and residents. The grounding occurred in the U.S. The injuries that resulted from the Defendants' negligence occurred primarily in the U.S. The repairs that resulted from Defendants' negligence and breach of contract were all made in the United States. The witnesses to those injuries and those repairs are

16

all in the U.S., and must be subject to U.S. process. Defendants' have had, and continue to have, numerous contacts with the United States and her citizens. The Defendants' facilities are less than a mile from U.S. terra firma and only a few hundred yards from U.S. waters and the Defendants', by design, benefit from that proximity. The only Canadian connection is the location of the Defendants and possibly a couple of their suppliers and/or ex-employees. U.S. law should apply to this case, and U.S. Courts should apply it.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court deny Defendants' Motion to Dismiss based on forum non conveniens and allow this matter to proceed in this Court.

Respectfully submitted,

POTTER, DeAGOSTINO, CAMPBELL & O'DEA

STEVEN M. POTTER (P33344)

RICK J. PATTERSON (P55706)

Attorneys for Plaintiffs

2701 Cambridge Court, Suite 223

Auburn Hills, Michigan 48326

Dated: September 25, 2003          (248) 377-1700

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED